[Cite as *State v. McCoy*, 2021-Ohio-456.]

**IN THE COURT OF APPEALS OF OHIO**
**SECOND APPELLATE DISTRICT**
**CHAMPAIGN COUNTY**

| | | |
|---|---|---|
| STATE OF OHIO | : | |
| | : | |
| Plaintiff-Appellee | : | Appellate Case No. 2020-CA-13 |
| | : | |
| v. | : | Trial Court Case Nos. 2018-CR-196 & |
| | : | 2020-CR-44 |
| MITCHELL EDWARD MCCOY | : | |
| | : | (Criminal Appeal from |
| Defendant-Appellant | : | Common Pleas Court) |
| | : | |

. . . . . . . . . . .

O P I N I O N

Rendered on the 19th day of February, 2021.

. . . . . . . . . . .

JANE A. NAPIER, Atty. Reg. No. 0061426, Champaign County Prosecutor's Office, Appellate Division, 200 North Main Street, Urbana, Ohio 43078
    Attorney for Plaintiff-Appellee

BENJAMIN W. ELLIS, Atty. Reg. No. 0092449, 817B Patterson Road, Dayton, Ohio 45419
    Attorney for Defendant-Appellant

. . . . . . . . . . . . .

DONOVAN, J.

{¶ 1} Mitchell Edward McCoy appeals from the trial court's judgment which found that he had violated his community control sanctions by failing to obey federal, state and local laws and ordinances, revoked his community control, and imposed prison sentences of 12 months in Champaign C.P. No. 2018-CR-196 and 12 months in Champaign C.P. No. 2020-CR-44, to be served consecutively.

{¶ 2} On November 5, 2018, McCoy was indicted in Case No. 2018-CR-196 on one count of possession of cocaine, in violation R.C. 2925.11(A)(C)(4)(a), a felony of the fifth degree, one count of aggravated possession of drugs, in violation of R.C. 2925.11(A)(C)(1)(a), a felony of the fifth degree, and one count of possession of marijuana, in violation of R.C. 2925.11(A)(C)(3)(a), a minor misdemeanor. McCoy filed a motion for intervention in lieu of conviction, which the trial court denied after a hearing; at the hearing, the court also addressed certain bond violations reported by Pretrial Services, which McCoy admitted, namely failing to appear for a pretrial services appointment and twice using marijuana. The court continued McCoy's bond.

{¶ 3} On January 28, 2019, McCoy pled guilty to the count of possession of cocaine in Case No. 2018-CR-196, and the other two counts were dismissed. Sentencing was held on March 4, 2019. The trial court's judgment entry of conviction stated that "[p]rior to engaging in the sentencing hearing, the Court reviewed with the Defendant certain allegations of violation of bond," namely that McCoy twice tested positive for marijuana and failed to attend drug treatment as ordered. The court noted that McCoy admitted the bond violations, and it found him guilty thereof. The court imposed community control for three years with additional special conditions, including that McCoy "successfully gain admission to, and complete, the West Central Community

Based Correctional Facility [WCCBCF] residential program."

{¶ 4} On March 7, 2019, the court filed an entry stating that it had received a correspondence from McCoy, which was attached, requesting that the court modify his residential commitment to West Central's outpatient program. The court denied the request.

{¶ 5} On March 8, 2019, the court issued an entry stating that McCoy had been accepted for treatment in the WCCBCF program. In accordance with the terms of McCoy's community control, the court ordered him to successfully complete the program.

{¶ 6} On March 15, 2019, the court issued an entry stating that, in the course of the admission process to the WCCBCF program, McCoy had been ordered to report to the Tri-County Regional Jail, and that a probation officer reported to court staff that McCoy had possessed marijuana and tested positive for marijuana at the jail. The court ordered the Adult Parole Authority to investigate the incident and suspended McCoy's admission to WCCBCF.

{¶ 7} On March 19, 2019, the State filed a notification of its intent to pursue a misdemeanor charge against McCoy based upon the marijuana found on McCoy's person in the jail. On March 22, 2019, the court issued an entry stating that McCoy's conduct at the jail "require[d] community control violation review." The court ordered the assigned probation officer to file violation allegations regarding McCoy's conveyance of marijuana into the jail if the officer believed the evidence supported the allegations.

{¶ 8} On March 25, 2019, the probation officer filed a notice of supervision violation regarding the possession of marijuana and positive drug test. After a hearing, the court continued McCoy on community control.

**{¶ 9}** On August 8, 2019, the court issued an entry stating that Probation Officer Herbert Nicholson had requested a community control violation hearing, and the court scheduled that hearing for the following day; the basis for the violation was that McCoy failed to successfully complete WCCBCF. At the violation hearing, McCoy appeared in court via video from the jail and represented that he was indigent. The court scheduled an arraignment hearing for August 13, 2019. McCoy again appeared via video from the jail at that time. The court noted that McCoy did not contest the existence of probable cause, and it found probable cause to hold a community control violation hearing. The court further noted that McCoy did not contest the merits of the violation. The court scheduled a violation hearing and granted McCoy's request for a personal recognizance bond.

**{¶ 10}** After a hearing on August 22, 2019, the court found that McCoy committed the offense of failing to successfully complete WCCBCF while under a community control sanction. The court also noted that McCoy was on probation to Champaign County Municipal Court in Case No. 2018-CR-605 for underage consumption, a misdemeanor of the first degree. The court returned McCoy to community control.

**{¶ 11}** On February 25, 2020, a notice of supervision violation was issued, stating that on various dates in February 2020, McCoy had violated his curfew, used methamphetamines, used marijuana, entered a bar, and consumed alcohol, and that he had failed to complete community service hours. On February 28, 2020, after a hearing, the court found probable cause to hold a community control violation hearing.

**{¶ 12}** On March 4, 2020, the State filed a motion to continue the hearing, because McCoy had been indicted on two felony counts of drug possession in Champaign C.P.

No. 2020-CR-44,[1] and the new charges were based on conduct alleged in his community control violation charges. According to the State, the State and McCoy were "still in communication regarding a resolution for both matters." The motion stated that McCoy was in the Tri-County Regional Jail "on this matter as well as on his new case." The court scheduled the matter for a status conference on March 6, 2020.

{¶ 13} On March 6, the court filed an entry under both case numbers. The entry provided that, in Case No. 2018-CR-196, in exchange for McCoy's admission to the community control violations, the State would recommend a return to community control, with the "special added condition" that McCoy complete the WCCBCF program. The court followed this recommendation and returned McCoy to community control in that case. With respect to Case No. 2020-CR-44, the entry stated that McCoy had been indicted on one count of aggravated possession of drugs and possession of cocaine, and that as part of a negotiated plea agreement, McCoy agreed to plead guilty to possession of cocaine. The court imposed three years of community control in that case. The court further stated that if McCoy's community control were revoked, the court would impose a sentence of 12 months in each case, to be served consecutively, for an aggregate term of 24 months.

{¶ 14} On March 11, 2020, a notice of supervision violation was issued, which alleged that on or about 20,March 9, 2020, McCoy had threatened "to hire a person or person(s) to do bodily [harm] to [his former girlfriend, H.R.] in and around Champaign County, Ohio." Such action violated Condition of Supervision Rule #1, namely, that

---

[1] McCoy's indictment for aggravated possession of drugs, in violation of R.C. 2925.11(A)(C)(1)(a), and possession of cocaine, in violation of R.C. 2925.11(A)(C)(4)(a), both felonies of the fifth degree, was dated March 2, 2020.

McCoy would "obey federal, state and local laws and ordinances, * * *."

{¶ 15} The court scheduled a hearing, but on March 23, 2020, the court continued the matter due to the COVID-19 pandemic. The following day, McCoy filed a motion to be released from the Tri-County Regional Jail to reside with his brother.

{¶ 16} On March 25, 2020, another notice of supervision violation was issued, which set forth the same violation as the March 11, 2020 notice. On the same day, the court also denied McCoy's request for release from jail, because McCoy was alleged to have threatened to hire a third party to do bodily harm to his ex-girlfriend three days after being returned to community control supervision. Therefore, the court found McCoy to be a threat to public safety.

{¶ 17} On April 2, 2020, the court denied a pro se request by McCoy to be released on electronic monitoring or recognizance bond. The entry noted that counsel had filed a similar motion on March 24, which was denied, and that McCoy's pro se motion seemed to contain "admissions of guilt to the community control violation allegations."[2]

{¶ 18} At a hearing on April 14, 2020, the prosecutor represented to the court that McCoy would plead guilty to the community control violation involving H.R., and McCoy acknowledged his intention to do so. The following exchange occurred at the hearing:

THE COURT: I should tell the parties at the outset, and I don't know if this changes the Defendant's admission decision, but the Defendant was rejected for admission to West Central. And they say, in their rejection letter, that you would not be accepted. Thus, we are declining Mr. McCoy's

---

[2] McCoy's pro se correspondence stated in part: "I want to start off by apologizing for what I said about my ex [H.R.]. I would never want any actual harm to be done to her. I was just hurt and trying to vent my feelings about things that transpired between she and I."

admission to West Central given his recent suicide attempt and ongoing medical requirements. We suggest that the Monday Program may be a better fit for Mr. McCoy.

I tell you that, not because the Court is suggesting Monday at this point. I'm telling you this because the Court has indicated that if the Defendant was not admitted to West Central, then the Defendant would be returned to Court for disposition determination. So we not only have this merits hearing, but we also have the decision on what to do. And it should be very clear to everybody that the Court is, at this point, not saying it will follow West Central's recommendation. I'm just making it a matter of knowledge that West Central has rejected the Defendant.

And for completeness of the record, I'm also saying they are recommending Monday. But I don't know if I - - that the Court has concluded that Monday is the best place at this point. I don't know if that changes the Defendant's desire to enter this admission or not. But we're going to pause so [defense counsel] will have an opportunity to speak to his client.

[DEFENSE COUNSEL]: Your Honor, he still wants to proceed to the admission to the violation.

THE COURT: * * * Is that accurate, Mr. McCoy?

[MCCOY]: Yes, Your Honor.

{¶ 19} McCoy advised the court that he had reviewed the discovery packet with counsel and had sufficient time to discuss his case with counsel. McCoy stated that he

had confidence in his attorney and had received enough information about the case to enter his admission knowingly intelligently, and voluntarily. McCoy indicated that he had not previously been to prison.

{¶ 20} The following exchange occurred:

THE COURT: Do you understand that if your community control is revoked in 2018 CR 196, you'll receive 12 months to prison. And in case number 2020 CR 44 you would receive 12 months to prison. The sentences would be served consecutively to each other for a total sentence of 24 months. Do you understand that?

THE WITNESS: Yes, Your Honor.

* * *

THE COURT: Do you understand that the Court is not required to follow the recommendations of the Prosecutor, your attorney, or yourself?

THE WITNESS: Yes, Your Honor.

THE COURT: Do you understand that the Court is not required to follow the recommendations of West Central?

THE WITNESS: Yes, Your Honor.

THE COURT: At the time of sentencing, the Court has to determine whether to return you to community control or send you to prison. If you are returned to community control, the Court can also extend your period of supervision not to exceed five years, impose new sanctions, or give you a more restrictive sanction like placement in jail or in a residential facility. Do you understand that?

THE WITNESS:   Yes, Your Honor.

**{¶ 21}** The court advised McCoy regarding post-release control and the consequences of any violation thereof.

**{¶ 22}** The following exchange continued:

THE COURT:   Do you believe you understand what you are doing today?

THE WITNESS:   Yes, Your Honor.

THE COURT:   Are you doing this of your own free choice?

THE WITNESS:   Yes, Your Honor.

THE COURT:   Do you understand the nature of the charges against you?

THE WITNESS:   Yes, Your Honor.

THE COURT:   Do you understand the maximum penalties involved?

THE WITNESS:   Yes, Your Honor.

THE COURT:   Do you understand that an admission of the merits [is] a complete admission of your guilt?

THE WITNESS:   Yes, Your Honor.

THE COURT:   Do you understand that if the Court accepts your admission to the merits, you can be sentenced immediately?

THE WITNESS:   Yes, Your Honor.

THE COURT:   Do you understand that if the Court accepts your admission to the merits you give up certain Constitutional rights; and those

include the right to attend a merits hearing?

THE WITNESS: Yes, Your Honor.

THE COURT: Do you understand that you give up the right to confront witnesses against you, which is also known as the right to face those who accuse you and cross-examine them?

THE WITNESS: Yes, Your Honor.

THE COURT: Do you understand that you give up the right to have compulsory process for obtaining witnesses in your favor, which means that you give up the right to have witnesses attend and testify in your favor pursuant to subpoena?

THE WITNESS: Yes, Your Honor.

THE COURT: Do you understand that you give up the right to make the State prove your guilt by a preponderance of the evidence before you are found guilty?

THE WITNESS: Yes, Your Honor.

THE COURT: Has anybody made any threats against you to make you enter this admission?

THE WITNESS: No, Your Honor.

THE COURT: Has anybody made any promises to you or any promises to recommend something on your behalf to get you to enter this admission?

THE WITNESS: No, Your Honor.

THE COURT: Does the State believe it has fully complied with the

Rules of Criminal Procedure regarding discovery?

[THE PROSECUTOR]:   Yes.

THE COURT:   Does defense counsel share that belief?

[DEFENSE COUNSEL]:   I do.

THE COURT:   Do you understand that your lawyer and the State believe that you've been given all the information you are entitled to, Mr. McCoy, so that you can make a knowing, intelligent, and voluntary decision as to entering an admission?

THE WITNESS:   Yes, Your Honor.

THE COURT:   Does the State believe it has sufficient information to prove the Defendant's guilt?

[THE PROSECUTOR]:   Yes.

THE COURT:   Do you understand that the State believes they can prove you guilty?

THE WITNESS:   Yes, Your Honor.

THE COURT:   Do you have any defense to the charge, meaning, any reason you should be found not guilty?

THE WITNESS:   No, Your Honor.

THE COURT:   Are you admitting that with regard to Violation 1 that on or about March 9, 2020, you did threaten to hire a person or persons to do bodily harm to [H.R.] in and around Champaign County, Ohio?

THE WITNESS:   Yes, Your Honor.

THE COURT:   Court has reviewed the complaint and admission of

the Defendant. Court finds Defendant guilty of the violation behavior. We will proceed to consider disposition. * * *

{¶ 23} The State then indicated that it had reviewed McCoy's case file and spoken with his supervising officer, Officer Nicholson. Based on that information, the State recommended that McCoy be returned to community control in both cases under the same terms and conditions previously imposed. The State requested that, with regard to the West Central placement, the court's order be modified so that McCoy would be sent to the Monday Program or another appropriate community-based correctional facility (CBCF) program, at the court's discretion. The State noted that it "believe[d] that the short time period between this incident and the previous incident continue[d] to demonstrate that [McCoy] ha[d] shown maturity and growth. That he ha[d] shown the ability to utilize the tools and resources available to him."

{¶ 24} According to the State, McCoy's supervising officer, Officer Nicholson, continued to believe that he could work with McCoy, notwithstanding that Nicholson also thought that McCoy's behavior "was important enough to warrant a community control violation" being filed against him. Nicholson also continued to believe that a CBCF was most appropriate for McCoy. The State asserted that the Monday Program was an option and that Officer Nicholson and the prosecutor had spoken about the CBCF in the Toledo area that was another potential option for McCoy.

{¶ 25} Although no violation report about the incident was prepared, the State provide the following information regarding the violation at the hearing:

[THE PROSECUTOR]: I believe the Defendant explains in his own words the factual basis. But for the Court's understanding as well, the Defendant

was having a conversation with Derick Long over at the jail. Mr. Long is a counselor for TCN. During that conversation between the Defendant and Mr. Long the Defendant made statements about physically harming [H.R.] and hiring somebody and paying them, I believe, $2,000 to harm her. Mr. Long is a mandatory reporter and felt, as his duty as a TCN counselor at the jail, he had a duty to report that incident to Officer Nicholson and go through the appropriate channels.

THE COURT: So he was going to pay or he had paid?

OFFICER NICHOLSON: Was.

* * *

THE COURT: Officer Nicholson, what do you know about this incident?

OFFICER NICHOLSON: The Defendant was making arrangements. And the allegation is that he did not make the money exchange, but he was going to arrange it. At that point Mr. Long alerted me of that. And I did go out and interview the Defendant. As well as speak to [H.R.] and let her know that if there was any future contact, she had to report it to me.

THE COURT: What was the reason why the Defendant wanted to have her harmed?

OFFICER NICHOLSON: There were several problems with the relationship. Mainly, he believed that she cheated.

THE COURT: Did you speak to the Defendant about these allegations?

OFFICER NICHOLSON:   I did.

THE COURT:   And is that what this State's Exhibit 1 letter is about.

OFFICER NICHOLSON:   Yes, sir.

THE COURT:   Did he indicate when he did this?   When he - - or who he contacted when he made the contact?

OFFICER NICHOLSON:   No.   He reported to me that he was simply blowing off steam during the interview with the counselor.   He did not indicate, you know, he had made any contacts.   I did review the jailhouse calls up to that point and there was no indication that he made those arrangements.

* * *

THE COURT:   So while the Defendant perhaps had these feelings he had not, to your knowledge, acted on them?

OFFICER NICHOLSON:   That's correct.

* * *

THE COURT:   Counsel for Defendant?

[DEFENSE COUNSEL]: * * * I spoke with Amanda Call, counselor for TCN Behavioral Health who counseled Mr. McCoy at the Tri-County Jail. In our discussion, Amanda was concerned about Mitch's substance abuse and mental health problems and anger management issues.   She felt that Mitch needed to be in a program such as the Christopher House in Xenia. She thought that all of those issues with Mitch could be addressed there. Where, at the time, she was thinking West Central would not be able to

address those.

She was very committed to her belief that Christopher House is the type of program that Mitch needed to overcome these serious issues that he has had in the past. And for that reason, Your Honor, we * * * ask that the Court consider that as a possible solution for disposition.

{¶ 26} The court then allowed McCoy to speak and the following exchange occurred:

THE WITNESS: * * * I just want to start off by apologizing by returning back in your courtroom, Your Honor. I don't want to be here. I'm sure you don't want to see me back in here. Me and the whole [H.R.] situation, I was in my feelings. I was in pain. I would never hurt nobody. I would never hurt her. I still love her. Even though she did what she did to me and I did what I did to her, I still love her. I would never do nothing to her. I was just in my feelings and venting.

And I just ask, please, I'm tired of being locked down and tired of being locked up. I'm tired of being away from my family. I haven't seen my family for like a month with this whole coronavirus. * * * I just want to say I'd never hurt nobody. And I'm not. And I'm not a threat to nobody. * * *

THE COURT: * * * When you say that what she did to me and I did to her, what did she do to you?

THE WITNESS: We was - - she cheated on me while I was at West Central. I got out. While I was out - - and I tried to work things out with her. I wasn't able to. I couldn't live with it. And I cope with s*** different

than other people do. I do drugs. That is why I got high. I didn't talk to somebody. I try to deal with them on my own.

And another thing is, I was still checking in with Herb. I never ran on him. I was still coming to see Chelsea, I was still doing what I had to do there. I have never ran from nobody. I always came to my court hearings. I just want you to know that too.

THE COURT: * * * I'm looking at your very first journal entry of conviction where it says on December 17, 2018, Defendant failed to appear at a Pretrial Services appointment. And then on February 2019 you failed to attend drug treatment counseling as ordered.

* * *

THE COURT: So when you say what I did to her, I'm not sure I understand. You taking drugs, how that means you did something?

THE WITNESS: I started getting high. I was getting high. And she didn't want me to. And she asked me to stop, but I didn't.

THE COURT: I am sure that Derick Long has dealt with people who have, quote, blown off steam. And I'm sure, as a counselor who is in the business of treating people who get angry during their sessions, that he's learned over the years what it means to blow off steam versus, hey, there is something here that really causes me some concern. Would you agree with that generally?

THE WITNESS: Yes, Your Honor, I would.

THE COURT: Okay.

THE WITNESS:   I would, Your Honor.

THE COURT: * * * So what is it about your situation with him that caused him to say, hey, this is pretty serious.   I got to report this?

THE WITNESS:   I have no idea, Your Honor.

THE COURT:   That's the problem.

THE WITNESS:   I have no idea.

THE COURT:   That's the problem.

THE WITNESS:   I would never hurt nobody though.

THE COURT:   When I placed you on community control the first time - - I thought I had put it in one of your entries that specifically talked about your maturity.   Yeah.   It is in your third journal entry of sentencing, which would be Thursday, August 22, 2019.   And I said I was going to return you to community control despite, among other things, your lack of maturity, your intolerant disposition, and your co-dependency on family members that infringe on your personal development.   So now I got a situation where a counselor finds enough validity in what you say that you're going to harm [H.R.].

{¶ 27} At the sentencing hearing, the court stated in part:

Court notes that this is the Defendant's fourth community control violation in the 2018 case.   Court notes that Defendant committed the first violation in the 2020 case three days after being returned to community control in the '18 case.   And three days after being granted community control supervision in the '20 case.   Court finds that the community control

violation involved the communication of the intention to cause physical harm to a woman he had motivation to injure due to her infidelity. The Court finds that the violation involved a communication of the intention to pay a third party $1,000 to cause physical harm to a woman who, quote, cheated on him, close quote, during his residence to a CBFC program.

* * * Court recognizes that there is no indication that has been found that Defendant arranged payments through phone calls from the jail. But the Court does recognize this is mitigated by the Defendant's ability to make undetected arrangements through the U.S. mail. The Court also acknowledges that no harm has come to the victim as of today.

{¶ 28} The court then imposed the aggregate 24-month sentence was described above.

{¶ 29} McCoy raises a single assignment of error on appeal:

REVOCATION OF APPELLANT'S COMMUNITY CONTROL WAS BASED ON EVIDENCE WHICH NEITHER DESCRIBES NOR SUPPORTS A VIOLATION OF LAW.

{¶ 30} McCoy asserts that threatening to hire a person or persons to do bodily harm to H.R. was not a violation of the community control requirement to obey federal, state and local laws and ordinances, because the alleged conduct was not a violation of any federal, state and local law or ordinance. McCoy asserts that he "obviously did not complete his threatening conduct," so the State "likely cast [his] behavior as attempted menacing." He further argues that menacing only exists where an offender knowingly causes another to believe the offender will cause physical harm to the person, citing R.C.

2903.22, and if the victim is not in fact intimidated, the offender's conduct would constitute only an attempted menacing. McCoy asserts that his behavior might also be viewed as an attempted assault, but a "[c]riminal attempt can only occur where there is an act or omission which constitutes a substantial step towards the commission of a crime, and that substantial step strongly corroborates the actor's criminal purpose." According to McCoy, such a step did not occur in his case.

{¶ 31} McCoy asserts that the evidence in the record did not support "a substantial step or criminal purpose," where his only communication was with his mental health counselor, an implicitly confidential relationship." According to McCoy, he would have reasonably and naturally expected that his "menacing" statements would not be communicated to his ex-girlfriend through the counselor, and thus would not have been intimidating to her.

{¶ 32} McCoy argues that "it is unclear what specific crime or violation of law was suspected or alleged." He asserts that the alleged attempt to menace his ex-girlfriend was supported "only by the trial court's own conjecture that [McCoy] would have been able to send a letter arranging the crime. McCoy asserts that there was insufficient proof that criminal conduct actually occurred. He also argues that his statement to the counselor could not reasonably be construed as a "substantial step in furtherance" of intimidation; he was only "blowing off steam."

{¶ 33} The State responds that McCoy admitted to the merits of the allegations while being assisted by competent counsel and did not object to the trial court's finding of guilt "on the basis that his conduct did not rise to the level of a violation of law." The State notes that McCoy also did not dispute the State's assertion at the hearing that it

had sufficient information to prove McCoy's guilt.

{¶ 34}   According to the State, McCoy's argument ignores the fact that he admitted to the subject violation after he was given "a full and complete opportunity to challenge the State's allegations and to argue that his community control should not be revoked." The State also argues that McCoy's argument "is essentially an attempt to re-litigate this matter even though he admitted to the merits of the allegations set forth in the notice of violation." Finally, the State argues that, regardless of whether McCoy's threat to his counselor regarding harming the victim could be considered harmless, as McCoy had argued to the trial court and now argues on appeal, "the violation was nevertheless established by his admission."

{¶ 35} As this Court has noted:

The right to continue on community control depends upon compliance with the conditions of community control and is a matter within the sound discretion of the trial court. *State v. Lewis*, 2d Dist. Montgomery No. 23505, 2010-Ohio-3652, ¶ 11. "[A] revocation of community control punishes the failure to comply with the terms and conditions of community control, not the specific conduct that led to the revocation." *State v. Black*, 2d Dist. Montgomery No. 24005, 2011-Ohio-1273, ¶ 17. Crim.R. 32.3, which governs revocation of community control, provides that the trial court "shall not impose a prison term for violation of the conditions of a community control sanction or revoke probation except after a hearing at which the defendant shall be present and apprised of the grounds on which action is proposed."

"Community control violation proceedings are not equivalent to criminal prosecutions." *Black* at ¶ 12. Nevertheless, "[a] defendant is entitled to certain due process protections before a court may revoke community control sanctions, although the full panoply of rights due a defendant in a criminal prosecution does not apply to the revocation of community control." *State v. Harmon*, 2d Dist. Champaign No. 2007-CA-35, 2008-Ohio-6039, ¶ 6, citing *Morrissey v. Brewer*, 408 U.S. 471, 480, 92 S.Ct. 2593, 33 L.Ed.2d 484 (1972). First, a defendant is entitled to a preliminary hearing to determine whether there is probable cause to believe that the defendant has violated the terms of his or her community control. *Gagnon v. Scarpelli*, 411 U.S. 778, 93 S.Ct. 1756, 36 L.Ed.2d 656 (1973); *State v. Blakeman*, 2d Dist. Montgomery No. 18983, 2002-Ohio-2153. Second, due process requires a final hearing to determine whether community control should be revoked. *Id.*

At the final revocation hearing, the State must (1) provide the defendant with written notice of the alleged violations of community control; (2) disclose the evidence against the defendant; (3) give the defendant an opportunity to be heard in person and to present witnesses and documentary evidence; (4) allow the defendant to confront and cross-examine adverse witnesses; (5) afford the defendant a neutral and detached hearing body; and, (6) provide the defendant with a written statement by the fact finder as to the evidence relied upon and the reasons for revoking community control. *State v. Klosterman*, 2d Dist. Darke Nos.

2015-CA-9 and 2015-CA-10, 2016-Ohio-232, ¶ 15; *State v. Gilreath*, 2d Dist. Greene No. 2000-CA-1, 2000 WL 896319, * 2 (July 7, 2000).

A defendant may elect to forgo a hearing on the merits of the alleged community control violations and admit to the violations. Where a defendant elects to do so, the trial court is not required to comply with the requirements of Crim.R. 11, which governs pleas. *State v. Cunningham*, 2d Dist. Clark Nos. 2014-CA-99 and 2014-CA-100, 2015-Ohio-2554, ¶ 14. Unlike in felony plea hearings, the trial court is not required to notify a defendant at a community control revocation hearing of the maximum prison sentence that may be imposed. That notification must have been provided at the original sentencing (if no prior revocation hearing had been held) or at the most recent revocation hearing (if multiple revocation hearings had been held). *State v. Fraley*, 105 Ohio St.3d 13, 2004-Ohio-7110, 821 N.E.2d 995.

Upon revoking a defendant's community control, the trial court may (1) lengthen the term of the community control sanction; (2) impose a more restrictive community control sanction; or (3) impose a prison term on the offender, provided that the prison term is within the range of prison terms available for the offense for which community control had been imposed and the term does not exceed the prison term specified in the notice provided to the offender at the original sentencing hearing. R.C. 2929.15(B); *see State v. Brooks*, 103 Ohio St.3d 134, 2004-Ohio-4746, 814 N.E.2d 837, paragraph two of the syllabus.

*State v. Norman*, 2d Dist. Clark Nos. 2017-CA-40, 2017-CA-41, 2018-Ohio-993, ¶ 16-20.

**{¶ 36}** State's Exhibit 1, McCoy's written statement, states on one page:

\* \* \*

Look I'm sorry about everything I have done and said you know I went to West Central back in 2019 and I was engaged with [H.R.] [while] I was gone she cheated on me and when I got out she still did it to me so I said f\*\*\* it and started getting high but what I said about paying someone to beat her up I really didn't mean it I promise I still love her so much but I don't want nothing to do with [her] anymore I just want to go to this program to get myself back together.

**{¶ 37}** On another page, McCoy wrote: "I talked to [counselor] [Derick] Long I told him I was going to pay someone to beat up [H.R.] but I really don't mean it I still love her I'm sorry." The page was dated March 9, 2020.

**{¶ 38}** The trial court's revocation of McCoy's community control was based upon McCoy's admission that he "did threaten to hire a person or persons to do bodily harm" to H.R. in the course of a counseling session at the jail. In sentencing McCoy, the court appropriately relied upon his admission to a violation of Rule of Supervision No. 1. Given this admission, McCoy cannot now argue his verbal threat did not constitute a crime. Notably, the record establishes that McCoy's statement was communicated to H.R., and as we recently noted in *State v. Stutz*, 2020-Ohio-6959, __ N.E.3d __, ¶ 10 (2d Dist.), this statement would constitute the offense of menacing. "The [aggravated] menacing statute does not require a threat to be made directly to the victim." *Id.* at ¶ 13. Accordingly, the assignment of error is overruled.

**{¶ 39}**  The judgment of the trial court is affirmed.

. . . . . . . . . . . . .

TUCKER, P.J. and HALL, J., concur.


Copies sent to:

Jane A. Napier
Benjamin W. Ellis
Nick A. Selvaggio